2020 IL App (2d) 121216-B
No. 2-12-1216
Opinion filed September 29, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 10-CF-4004 |
| DRESHAWN LUNA, | ) ) ) | Honorable Mark L. Levitt, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Presiding Justice Birkett and Justice Schostok concurred in the judgment and opinion.

**OPINION**

¶ 1    In 2012, a jury convicted defendant, Dreshawn Luna, of first-degree murder (720 ILCS 5/9-1(a)(1) (West 2010)) and aggravated battery with a firearm (720 ILCS 5/12-4.2(a)(1) (West 2010)) for crimes that he committed on July 4, 2010, when he was age 15. The trial court sentenced defendant to consecutive prison terms totaling 51 years for the first-degree murder conviction (26 years for the murder, plus 25 years as an enhancement for personally discharging a firearm that proximately caused death) and 10 years for the aggravated battery conviction. On appeal, this court rejected defendant's arguments concerning ineffective assistance of counsel, the constitutionality of his sentence, and the jury instructions supporting the firearm enhancement.

However, we vacated a DNA fee and conducted, per defendant's request, an *in camera* inspection of sealed medical documents. *People v. Luna*, 2015 IL App (2d) 121216-U.

¶ 2 Presently, this case returns to us following our supreme court's entry of a supervisory order directing us to vacate our prior judgment, consider the effect of *People v. Buffer*, 2019 IL 122327, on the issue of whether defendant's sentence constitutes an unconstitutional *de facto* life sentence, and determine if a different result is warranted. *People v. Luna*, No. 119310 (Ill. Mar. 25, 2020) (supervisory order). For the following reasons, we affirm defendant's conviction, vacate his sentence, and remand this matter for a new sentencing hearing.

¶ 3                          I. BACKGROUND

¶ 4                          A. Trial

¶ 5 Detailed facts concerning the trial proceedings were set forth in our prior order, and we need not repeat them here. *Luna*, 2015 IL App (2d) 121216-U, ¶¶ 7-28. For context, however, we summarize that, on the evening of July 3, 2010, and into the early morning hours of July 4, 2010, there was a party at the Ramada Inn in Waukegan. Defendant played dice and lost money; later, in the parking lot, he complained that he needed his money back. Marquise Coleman asked defendant for his gun, and defendant removed it from his waistline. Coleman returned to the party with defendant's gun and robbed the people playing dice, including Farkhan Jones, at gunpoint. Coleman then returned to the parking lot, and defendant demanded that Coleman return the gun and the money that defendant had lost in the game. Coleman did so, and defendant waved at a car that was driving away, motioning for it to come over. A man, later identified as Patrick Enis, exited the vehicle and walked up to defendant. Enis and defendant appeared to have an unfriendly conversation. They walked toward the driver's side of the car. Coleman saw defendant point the

gun at the driver, Jones, and shoot. Jones died from his injuries. Enis ran away, and defendant shot at him while he was running.

¶ 6    Enis confirmed that he saw defendant take a gun out from his pocket and hold it near Jones's head. Jones leaned back and tried to push the gun out of his face. Enis testified that he turned to run and heard the first gunshot. He heard more gunshots and felt a bullet pass by him. Enis looked behind him to see if defendant was following him, and he saw defendant aiming a gun in his direction. Enis heard another shot and was hit in the back. Enis testified repeatedly that he was "100%" positive that defendant was the person who shot him. Another witness testified that, after the shooting, defendant, holding a gun on his lap, said that Jones was shot because he reached for the gun.

¶ 7    The jury convicted defendant of first-degree murder and aggravated battery with a firearm, further finding that he personally discharged the firearm used in those crimes.

¶ 8                    B. Sentencing

¶ 9    On October 12, 2012, the trial court denied defendant's motion for a new trial and proceeded to sentencing. The State emphasized that defendant had a history of repeated delinquency (which included committing burglary with his older brother at age nine), that an expert deemed him as potentially having antisocial personality disorder, and that, while detained, defendant had demonstrated a continued lack of respect for authority. The State argued that, in terms of mitigation, there was "absolutely nothing" to consider, and it requested a term of 90 years' imprisonment.

¶ 10    Defense counsel disagreed with the State's position and argued that "the mitigation is everywhere." Counsel emphasized that defendant was 15 years old at the time of the offense. Counsel explained that, while the presentence report included that defendant entered the system at

age nine, it also reflected that he was a charming, funny kid who related to his peers, was close to his family, received good grades, attended church, and actively participated socially. Counsel argued that the court was sentencing someone who was "not fully formed" at the time of the crimes and related the principles that had been enunciated in *Miller v. Alabama*, 567 U.S. 460 (2012), just a few months earlier. Namely, counsel argued that juveniles (1) lack maturity and have an underdeveloped sense of responsibility, leading to recklessness and impulsivity; (2) are more vulnerable to negative influences and outside pressures from family and peers; (3) lack the ability to extricate themselves from crime-producing settings, as they have limited control over their environment; and (4) do not have a fully-formed character like adults, and their actions are less likely to evidence irretrievable depravity. Moreover, counsel pointed out that defendant's impulsivity had, in fact, been noted in the presentence report and that there was "not an ounce of planning" in this tragic crime; rather, it reflected the momentary, impulsive act of a 15-year-old, as opposed to a premeditated act. In addition, defendant came from a broken home, his mother did not have time to adequately assist him with issues, and, accordingly, starting at a very young age, he was exposed to gang and crime culture and was in and out of counseling and treatment, without progress. Counsel argued that the sentencing scheme at play, which subjected a juvenile offender to the same sentence as an adult, improperly removed youth from the court's meaningful consideration. Counsel requested a sentence below the mandatory minimum, arguing that, under *Miller,* the mandatory sentence that defendant faced was inappropriate for a juvenile.

¶ 11 The court sentenced defendant to consecutive prison terms totaling 51 years for the first-degree murder conviction (26 years for the murder, plus 25 years as an enhancement for personally discharging a firearm that proximately caused death) and 10 years for the aggravated battery conviction. It noted that it was "deeply concerned" about defendant's lengthy history of

involvement in the juvenile justice system, commencing at age nine with a residential burglary, continuing thereafter, and then ending *after* these crimes, when he was arrested on the street with a loaded weapon. It stated that it considered "very carefully" defendant's age, the circumstances surrounding his upbringing and home life, the impact of his life on the streets, and his prospects for potential restoration to useful citizenship. Further:

> "It appears that throughout [defendant's] lifetime he has received a great deal of opportunity and benefit from the variety of probation officers and individuals that worked with him. Unfortunately, it appears that *** each effort to prevent this tragedy failed at every turn. That said, the sentence that I fashion today must take into account not only punitive measures *** [but I] also must address prospects for his rehabilitation, and restoration, and useful citizenship [which] I don't take lightly at all.
>
> In fact, I am deeply swayed by the defense's argument that his age—his tender age and his prospects for rehabilitation and restoration must play a very large role in the sentence that I meet [*sic*] out today. [Defendant's] conduct, however, in many ways ties my hands. Although he was given the opportunity to succeed at many turns, he has demonstrated repeatedly that he is not willing to conform his conduct to that of which is expected of citizens living in our community. It is true that he is a child in many ways, however, *not for purposes of sentencing* following conviction of first[-]degree murder and a sentence of aggravated battery with a firearm. Simply not the case." (Emphasis added.)

¶ 12 Defendant moved the court to reconsider his sentence. He argued that the court erred by not fully considering his age, particularly with respect to the mandatory 25-year firearm enhancement and the consecutive nature of the sentence, which, he argued, effectively resulted in a mandatory life sentence and violated *Miller*. The court then discussed with counsel that the

sentencing scheme that existed at the time mandated a minimum 51-year sentence for defendant. After confirming the mandatory minimum, the court continued:

"COURT: And you think what, you think that *Miller* stands for the proposition that I can disregard Illinois sentencing guidelines?

DEFENSE COUNSEL: [The United States] Supreme Court said that the Louisiana state court should have ignored Louisiana guidelines.

COURT: Okay.

DEFENSE COUNSEL: So, yes, I mean, yes, Judge, we think that in light of the Eighth Amendment to the United States Constitution, the Illinois Constitution, due process clauses of those constitutions, that, yes, that sentencing court should[,] in light of *Miller* ***, ignore what are called mandatory penalty schemes for juveniles."

¶ 13    Counsel continued, arguing that additional factors in mitigation should have been considered, in that the circumstances were not likely to reoccur, because defendant would never be a juvenile again, which, he opined, was a big factor contributing to the commission of the crimes. He further noted that the court found that 26 out of 27 possible aggravating factors did *not* apply in this case, which, counsel argued, should lean in defendant's favor.

¶ 14    In response, the State distinguished *Miller* factually and further argued that the court had sentenced defendant compassionately.

¶ 15    The court denied the motion to reconsider. It noted that it had issued close to the minimum sentence that defendant could have received under the "statutory sentencing schemes that are in place." The court explained that, although the statutory range for first-degree murder was 20 to 60 years, it had imposed upon defendant only 26 years, giving "extreme weight" to the fact that he was a minor, "[albeit] a minor with a delinquent history that is unlike many others." The court

further noted that, with respect to the enhancement for discharging the firearm, it had imposed the absolute minimum, and, finally, that it had imposed "close" to the minimum sentence for aggravated battery with a firearm (*i.e.*, 10 years in the 6-to-30-year range).

¶ 16                                C. Appellate Proceedings

¶ 17    On direct appeal, defendant argued that the mandatory transfer of juveniles to adult court in cases involving first-degree murder (705 ILCS 405/5-130 (West 2010)), the application to juveniles of mandatory firearm enhancements (see 730 ILCS 5/5-8-1(a)(1)(d) (West 2010)), the mandatory consecutive sentencing (see 730 ILCS 5/5-8-4(d)(1) (West 2010)), and the application of adult sentencing ranges and "truth in sentencing" provisions (730 ILCS 5/3-6-3(a)(2)(i), (ii) (West 2010) (requiring that he serve 100% of the murder sentence) did not permit consideration of his youthfulness at the time of the offense and, thus, his sentence was unconstitutional.  We rejected his arguments.  *Luna*, 2015 IL App (2d) 121216-U, ¶¶ 36-38.

¶ 18    Thereafter, the supreme court denied defendant's petition for leave to appeal, but, as noted, it directed this court to vacate our prior decision and to consider the effect, if any, of *Buffer* on defendant's sentence.  *Luna*, No. 119310.  We allowed the parties to submit supplemental briefing on the pertinent issue.

¶ 19                                II. ANALYSIS

¶ 20    Preliminarily, we note again that, although defendant's initial appeal raised multiple issues, we maintain our original holdings on all issues except the constitutionality of defendant's sentence, which we reconsider here.  See *Luna*, 2015 IL App (2d) 121216-U.

¶ 21    As detailed in our prior decision, the Supreme Court has issued a series of decisions that, collectively, reflect that mandatory life sentences for juvenile defendants violate the eighth amendment (U.S. Const., amend. VIII).  See *Miller*, 567 U.S. at 479 (even for those convicted of

homicide, the eighth amendment prohibits "a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders"); *Graham v. Florida*, 560 U.S. 48, 74 (2010) (when imposed on juvenile offenders for crimes other than homicide, a life sentence without the possibility of parole violates the eighth amendment); *Roper v. Simmons*, 543 U.S. 551, 568-73 (2005) (capital punishment for juvenile offenders violates the eighth amendment).[1] These decisions emphasize that juvenile offenders are inherently different from adult offenders and that minors have less moral culpability and greater rehabilitative potential than adult offenders. While not outright banning life sentences for juveniles convicted of homicide, the Court has held that a life sentence may not be *mandated* and that, before a life sentence may be imposed, the sentencing court must consider mitigating circumstances, such as the minor's youth and its "attendant circumstances." See *Miller*, 567 U.S. at 483, 489. *Miller* also made clear that "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." *Id.* at 479.

¶ 22 The Illinois Supreme Court has also issued decisions that, collectively, reflect that (1) *Miller* applies to discretionary, as well as mandatory, life sentences (*People v. Holman*, 2017 IL 120655, ¶ 40); (2) *Miller* applies to sentences that cannot be served in one lifetime and, thus, that have the same practical effect on a juvenile as a mandatory life sentence without parole (*People v. Reyes*, 2016 IL 119271, ¶¶ 9-10); and (3) any sentence exceeding 40 years is a *de facto* life sentence requiring the sentencing court to consider, before imposition, youth and its attendant circumstances (*Buffer*, 2019 IL 122327, ¶¶ 41-42). Thus, a juvenile defendant may be sentenced

---

[1] The eighth amendment and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) are generally read coextensively. See, *e.g.*, *People v. Patterson*, 2014 IL 115102, ¶ 101.

to natural life or a *de facto* life sentence; however, to comply with constitutional requirements, the sentencing court must first

> "determine[ ] that the defendant's conduct showed *irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation.* The court may make that decision only after considering the defendant's youth and its attendant characteristics. Those characteristics include, but are not limited to, the following factors: (1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." (Emphasis added.) *Holman*, 2017 IL 120655, ¶ 46 (citing *Miller*, 567 U.S. at 477-78).

¶ 23   Indeed, this State has now codified the *Miller* factors. Specifically, section 5-4.5-105(a) of the Unified Code of Corrections (Code) provides that, when a person under 18 years of age commits an offense, the trial court at the sentencing hearing shall consider the following factors in mitigation: (1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any; (2) whether the person was subjected to outside pressure, including peer pressure, familial pressure, or negative influences; (3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma; (4) the person's potential for rehabilitation or evidence

of rehabilitation, or both; (5) the circumstances of the offense; (6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense; (7) whether the person was able to meaningfully participate in his or her defense; (8) the person's prior juvenile or criminal history; and (9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate, although, if a defendant chooses not to make a statement on advice of counsel, a lack of an expression of remorse shall not be considered as an aggravating factor. 730 ILCS 5/5-4.5-105(a) (West 2016).

¶ 24    Here, defendant argues that, in light of the foregoing, his sentence constitutes an unconstitutional *de facto* life sentence, as the court was required to impose more than 40 years' imprisonment without adequate consideration of his youth and its attendant circumstances. The State does not dispute that, per *Buffer*, defendant received a *de facto* life sentence. Indeed, we agree that the applicable sentencing scheme, at that time, *mandated* a minimum 51-year sentence. See 730 ILCS 5/5-4.5-20(a) (West 2010) (range of 20 to 60 years for first-degree murder); 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2010) (mandatory add-on of 25 years to natural life); 720 ILCS 5/12-4.2(b) (West 2010) (aggravated battery with a firearm is a Class X felony); 730 ILCS 5/5-4.5-25(a) (West 2010) (range for a Class X felony is 6 to 30 years); 730 ILCS 5/5-8-4(d)(1) (West 2010) (providing for mandatory consecutive sentences). Moreover, defendant received a 61-year sentence, most of which must be served 100% (730 ILCS 5/3-6-3(a)(2)(i)-(ii) (West 2010)). As such, defendant received a *de facto* life sentence.

¶ 25    The State nevertheless disagrees that defendant's life sentence violates the eighth amendment. It contends that the trial court imposed the sentence only after considering defendant's youth and its attendant circumstances. Specifically, the State notes that defense counsel repeatedly emphasized defendant's youth and the *Miller* decision, both at sentencing and

when moving the court to reconsider the sentence. The State argues that the court had before it voluminous information (through the presentence report, argument, letters, and the record itself) that allowed it to adequately consider all of the relevant factors attendant to defendant's youth. In sum, the State contends that the evidence spoke to the circumstances of the offense and to defendant's youth and immaturity, outside negative influences, home environment, lack of rehabilitation, role in the offense, ability to participate in his defense, and prior juvenile history. As this information was before the court, the State concludes that the court properly considered it prior to sentencing and that, thus, defendant's sentence is not unconstitutional.

¶ 26    We agree that defendant's youth was considered at sentencing. The court expressly gave "great weight" to defendant's youth and was "deeply swayed" by defendant's "tender age." It also commented that it had considered his broken family life and the impact on him from street-gang influences. It made findings suggesting that defendant's juvenile record, which primarily concerned burglary, theft, and revocations of probation, did not bode well for his rehabilitative capacity, as he had not yet reformed his conduct, despite attempts at intervention. The court had evidence before it, such as psychological evaluations and caseworker comments in the presentence report, that defendant was at risk for adult antisocial personality disorder and likely needed long-term residential treatment.

¶ 27    Nevertheless, the admission of evidence and argument related to the *Miller* factors does not necessarily mean that those factors were adequately considered or evaluated to determine whether defendant was the rare juvenile simply beyond the possibility of rehabilitation. See, *e.g.*, *People v. Reyes*, 2020 IL App (2d) 180237, ¶ 31. While this is perhaps a close case, given the legal developments since defendant was sentenced, we find it prudent to err on the side of

concluding that defendant's sentence violates the eighth amendment and that he is entitled to a new sentencing hearing.

¶ 28     First, we infer from the court's comments that it believed that it had limited, if any, room for discretion in fashioning defendant's sentence.  The court discussed with defense counsel that the statutory minimums at the time did not give it *authority* to impose upon defendant less than the minimum required by Illinois law, a minimum that now would be considered a *de facto* life sentence.  The court noted that it imposed upon defendant terms on the lower end of the scale for the underlying crimes, as well as the minimum statutory firearm enhancement, but, again, the court understood that it was *bound* to apply the enhancement.  Critically to this case, however, the sentencing scheme for juveniles in this State has changed to now afford sentencing courts *discretion* to apply that enhancement.  See 730 ILCS 5/5-4.5-105(b), (c) (West 2018).

¶ 29     Second, the court commented that it could *not* consider defendant as a child for purposes of sentencing.  However, the framework for sentencing juvenile defendants to life imprisonment has since evolved.  Further, considering a defendant's youth generally is a far cry from finding that a defendant is the rare juvenile who committed conduct showing irreparable corruption beyond the possibility of rehabilitation.  See, *e.g.*, *Buffer*, 2019 IL 122327, ¶ 41; *Holman*, 2017 IL 120655, ¶¶ 45-46.  The State disagrees, noting that the court here considered that defendant did not appear to take advantage of the efforts previously taken to rehabilitate him and that he had a delinquent history unlike many others.  However, *all* juveniles who are theoretically eligible for life sentences will have committed horrific crimes, and we do not think it unreasonable to speculate that many such juveniles will possess delinquency histories or have failed attempts at intervention.  The current case law, however, instructs that *not* all of those juveniles eligible for life sentences should receive them; rather, a life sentence for a juvenile is appropriate *only* where that defendant is the

"*rare* juvenile offender" whose crime reflects "*irretrievable* depravity, *permanent* incorrigibility, or *irreparable* corruption beyond the possibility of rehabilitation." (Emphases added.) *Holman*, 2017 IL 120655; *Montgomery v. Louisiana*, 577 U.S. at ___, ___, 136 S. Ct. 718, 734 (2016). Indeed, the Court has clarified that it is not sufficient for a sentencing judge to merely "consider the juvenile's youth"; rather, the penological justifications for a life sentence without parole entirely collapse for the juvenile offender, unless that offender is the "rare" child whose crime reflects more than "unfortunate yet transient immaturity." (Internal quotation marks omitted.) *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 734. While express findings of incorrigibility are not required (*id.* at ___, 136 S. Ct. at 735), sentencing courts must still "determine" and somehow express, after considering the defendant's youth and the enumerated attendant circumstances, that "the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Holman*, 2017 IL 120655, ¶ 46. In our view, the court did not make those findings here.

¶ 30    Indeed, we note that there were, arguably, glimmers of hope in defendant's presentence report. He received good grades, he was an enthusiastic participant in group activities, he related to his peers and had strong family relationships. The crimes at issue, while horrible and senseless, were consistent with impulsive and immature behavior. The court was able to consider many factors, but it was simply *unable* to consider defendant's youth and the attendant circumstances under the framework that has since developed in case law, nor did it possess the discretion to impose less than a mandatory *de facto* life sentence.

¶ 31    In sum, courts look to evolving standards of decency that mark the progress of a maturing society. See *Buffer*, 2019 IL 122327, ¶ 16. We are reminded that "children cannot be viewed simply as miniature adults." *J.D.B. v. North Carolina*, 564 U.S. 261, 274 (2011). Certainly, the

framework for sentencing juveniles has markedly evolved since defendant's sentence was imposed here. The court considered some pertinent evidence at sentencing, but it did not have the benefit of the scope of analysis that has since been conducted concerning juvenile culpability, nor did it have at its disposal the current modifications to sentencing parameters. *Miller* had issued only a few months prior to defendant's sentencing, and *Reyes*, which held that *Miller* applied to juveniles receiving *de facto* life sentences, was not decided until four years later. Further, and as previously discussed, our state's codification of the *Miller* factors, the elimination of "mandatory" enhancements for juveniles, and *Buffer*, were all issued after defendant was sentenced. Accordingly, we conclude that defendant is entitled to a new sentencing hearing under the scheme prescribed by section 5-4.5-105 of the Code. *Buffer*, 2019 IL 122327, ¶ 47; see also *Reyes*, 2016 IL 119271, ¶ 12. We note that the sentencing judge must not simply claim to have followed the *Miller* factors; the judge must *use* those factors to evaluate evidence at the new sentencing hearing to determine whether defendant is "among the rarest of juvenile offenders whose conduct places him [or her] beyond the possibility of rehabilitation." See, *e.g.*, *Reyes*, 2020 IL App (2d) 180237, ¶¶ 31-32. We express no view about the sentence that defendant should ultimately receive; however, "[o]n remand, the trial court could once again impose a *de facto* life sentence only if it determines that the defendant is beyond rehabilitation." (Emphasis omitted.) *Id.* ¶ 32.

¶ 32    In sum, we affirm defendant's conviction, vacate his sentence, and remand for resentencing in accordance with this decision.

¶ 33                                III. CONCLUSION

¶ 34    For the forgoing reasons, the judgment of the circuit court of Lake County is affirmed in part and vacated in part. The cause is remanded for resentencing.

¶ 35    Affirmed in part and vacated in part.

¶ 36 Cause remanded.

---

**No. 2-12-1216**

| | |
|---|---|
| **Cite as:** | *People v. Luna*, 2020 IL App (2d) 121216-B |
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, No. 10-CF-4004; the Hon. Mark L. Levitt, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Thomas A. Lilien, and Jaime L. Montgomery, of State Appellate Defender's Office, of Elgin, for appellant. |
| **Attorneys for Appellee:** | Michael G. Nerheim, State's Attorney, of Waukegan (Patrick Delfino, Edward R. Psenicka, and Diane L. Campbell, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |