2020 IL App (2d) 120171-B
No. 2-12-0171
Opinion filed November 2, 2020

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Kane County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 08-CF-3321 |
| JOSHUA CAVAZOS, | ) ) ) | Honorable Timothy Q. Sheldon, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE JORGENSEN delivered the judgment of the court, with opinion.
Presiding Justice Birkett and Justice Zenoff concurred in the judgment and opinion.

**OPINION**

¶ 1    In 2011, a jury convicted defendant, Joshua Cavazos, of two counts of first-degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2006)), attempted first-degree murder (*id.* §§ 8-4(a), 9-1(a)(1)), unlawful possession of a stolen motor vehicle (625 ILCS 5/4-103(a)(1) (West 2006)), and aggravated discharge of a firearm (720 ILCS 5/24-1.2(a)(2) (West 2006)). These crimes were committed in 2007 when defendant was 17 years old. For the first-degree-murder and attempted-murder convictions, the jury found that defendant discharged the firearm used in those crimes. The trial court denied defendant's posttrial motion but granted, in part, his motion to reconsider his sentence and ultimately sentenced him to an aggregate of 75 years' imprisonment.

¶ 2 On appeal, we rejected defendant's arguments concerning the sufficiency of the evidence, jury instructions, proof of specific intent for the attempted murder, and, overall, the sentence's constitutionality. *People v. Cavazos*, 2015 IL App (2d) 120171.

¶ 3 This case returns to us following our supreme court's entry of a supervisory order that directed us to (1) vacate our prior judgment; (2) consider the effect of *People v. Buffer*, 2019 IL 122327, on the issue of whether defendant's sentence constitutes an unconstitutional *de facto* life sentence; and (3) determine if a different result is warranted. *People v. Cavazos*, No. 119208 (Ill. Mar. 25, 2020) (supervisory order). For the following reasons, we affirm defendant's conviction, vacate his sentence, and remand this matter for a new sentencing hearing.

¶ 4                                   I. BACKGROUND

¶ 5                                   A. Trial

¶ 6 Our prior order set forth detailed facts concerning the trial—we need not repeat them here. *Cavazos*, 2015 IL App (2d) 120171, ¶¶ 7-61. For context, however, we summarize that, on January 20, 2007, as 15-year-old Oscar Rodriguez and his girlfriend, Claudia Lozano, walked along High Street near Grove Street in Aurora, a sport utility vehicle drove past. The occupants threw gang signs and yelled gang slogans—then gunshots were fired, killing Rodriguez and injuring Lozano. Defendant, age 17, and his brother, Justin Cavazos, age 16, both members of the Insane Deuces street gang, were charged in connection with the incident. In 2011, the brothers were tried simultaneously (in adult court) by separate juries.

¶ 7 As previously noted, the jury convicted defendant of two counts of first-degree murder and found that he discharged the firearm that proximately caused Rodriguez's death. The jury also convicted defendant of attempted first-degree murder and found that he fired the weapon used in

that crime. Finally, the jury found defendant guilty of aggravated discharge of a firearm and unlawful possession of a stolen motor vehicle.

¶ 8                                    B. Sentencing

¶ 9     On January 18, 2012, the trial court denied defendant's motion for a new trial and proceeded to sentencing. The State emphasized defendant's gang involvement, violent history, and his callous attitude concerning his crimes.

¶ 10     In response, defense counsel stated to the court, "Unfortunately, any argument I can make really won't do much good considering the minimums here. The legislature has chosen to handcuff you either mitigation wise or nonmitigation wise [*sic*]." Counsel argued that, although defendant made some "bad choices," letters in the record reflected that in his early years defendant was a good person and that his bad choices did not mean that he could not be rehabilitated. Counsel asserted that, while no statutory mitigating factors "technically" applied, defendant's record aside from this case consisted of a few ordinance violations and one felony. Counsel asserted that, although the minimum sentence effectively equated to a life sentence, it would be appropriate because it would account for defendant's rehabilitative potential.

¶ 11     In announcing its sentence, the court noted that, while defendant was apparently a "very nice" young man and gifted athlete in his early years, his behavior altered after a custody modification. The court recounted that defendant's criminal history included a few minor offenses and a Class 3 felony. Defendant had declined to participate in an interview concerning his background. He had a young daughter and a family who would all be impacted by the imposed sentence. The court commented that, at a young age, defendant chose the Insane Deuces over many wonderful things in his life, including his freedom. It sentenced defendant to 25 years' imprisonment for first-degree murder (see 730 ILCS 5/5-8-1(a)(1)(a) (West 2006) (providing

range of 20 to 60 years)), with a 25-year add-on for discharging the firearm that caused the victim's death (see *id.* § 5-8-1(a)(1)(d)(iii) (add-on may be 25 years to natural life)). The court sentenced defendant to 10 years' imprisonment for attempted first-degree murder (see *id.* § 5-8-1(a)(3) (providing a range of 6 to 30 years)), with a 20-year add-on for discharging the firearm (see *id.* § 5-8-1(a)(1)(d)(ii)). The murder and attempted-murder sentences were to be served consecutively. See *id.* § 5-8-4(a)(1). Finally, the court sentenced defendant to three years' imprisonment for possession of a stolen motor vehicle (see *id.* § 5-8-1(a)(5) (providing a range of three to seven years)), to run concurrently with the attempted-murder sentence.

¶ 12    Defendant moved to reconsider the sentence, asking that the court grant the minimum aggregate sentence (which, in these circumstances, was 71 years' imprisonment), rather than the 80 years imposed, as the imposed sentence did not adequately take into account his rehabilitative potential. On February 12, 2012, the court granted the motion in part, reducing the murder sentence by 5 years (*i.e.*, to the minimum of 20 years), resulting in an aggregate 75-year sentence.

¶ 13                              C. Appellate Proceedings

¶ 14    On direct appeal, defendant raised multiple arguments, including a challenge to the constitutionality of the statutory provisions that resulted in his trial in adult court and his ultimate sentence. He argued that the confluence of (1) his mandatory transfer to adult court, (2) the application to juveniles of mandatory firearm enhancements, (3) mandatory consecutive sentencing, (4) adult sentencing ranges, and (5) "truth in sentencing" provisions did not permit consideration of his youthfulness at the time of the offense and, thus, his sentence was unconstitutional. We rejected his arguments. *Cavazos*, 2015 IL App (2d) 120171, ¶¶ 92-102. However, we questioned whether the General Assembly should revisit the juvenile sentencing scheme. We found "particularly troubling" the limitations placed upon a sentencing court's

discretion when mandatory sentencing enhancements applied to a juvenile offender. *Id.* ¶¶ 101-02. Moreover, we highlighted:

> "[H]ere, the court determined that 20 years' imprisonment was appropriate for [defendant's] decision to take another's life. However, it was required to impose another *25 years* to that sentence because [defendant] did so with a firearm. 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2006). Similarly, the court determined that 10 years' imprisonment should be imposed for [defendant's] attempted murder of a young girl. However, it was required to impose another *20 years*, indeed *twice* the underlying sentence, because [defendant] did so with a firearm. 730 ILCS 5/5-8-1(a)(1)(d)(ii) (West 2006). We do not suggest that the crimes at issue here or the use of a firearm during those crimes should be punished lightly, or that the instant sentence is inappropriate, but where there exists an evolving trend that the attendant circumstances of youth must be considered at sentencing, the court's restricted discretion and required imposition of an add-on that is more than what the court determines is reasonable for the underlying offense should, in our opinion, be revisited." (Emphases in original.) *Id.* ¶ 102.

¶ 15 Thereafter, our supreme court denied defendant's petition for leave to appeal. Still, as noted, it directed us to vacate our prior decision and to consider the effect, if any, of *Buffer* on defendant's sentence. *Cavazos*, No. 119208. We ordered the parties to submit supplemental briefing on the pertinent issue.

¶ 16                                  II. ANALYSIS

¶ 17 Preliminarily, we note again that, although defendant's initial appeal raised multiple issues, we maintain our original holdings on all issues except the constitutionality of defendant's sentence, which we reconsider here. See *Cavazos*, 2015 IL App (2d) 120171.

¶ 18    The United States Supreme Court has issued a series of decisions that, collectively, reflect that mandatory life sentences for juvenile defendants violate the eighth amendment (U.S. Const., amend. VIII). See *Miller v. Alabama*, 567 U.S. 460, 479 (2012) (even for those convicted of homicide, the eighth amendment prohibits "a sentencing scheme that mandates life in prison without possibility of parole for juvenile offenders"); *Graham v. Florida*, 560 U.S. 48, 74 (2010) (when imposed on juvenile offenders for crimes other than homicide, a life sentence without the possibility of parole violates the eighth amendment); *Roper v. Simmons*, 543 U.S. 551, 568-73 (2005) (capital punishment for juvenile offenders violates the eighth amendment).[1] These decisions emphasize that juvenile offenders are inherently different from adult offenders and that minors have less moral culpability and greater rehabilitative potential than adult offenders. While not outright banning life sentences for juveniles convicted of homicide, the Court has held that a life sentence may not be *mandated* and that, before a life sentence may be imposed, the sentencing court must consider mitigating circumstances, such as the minor's youth and its "attendant characteristics." See *Miller*, 567 U.S. at 483, 489. *Miller* also made clear that "appropriate occasions for sentencing juveniles to this harshest possible penalty will be uncommon." *Id.* at 479.

¶ 19    The Illinois Supreme Court has also issued decisions that, collectively, reflect that (1) *Miller* applies to discretionary, as well as mandatory, life sentences (*People v. Holman*, 2017 IL 120655, ¶ 40); (2) *Miller* applies to *de facto* life sentences, or sentences that cannot be served in one lifetime and, thus, that have the same practical effect on a juvenile as a mandatory life

---

[1] The eighth amendment and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) are generally read coextensively. See, *e.g.*, *People v. Patterson*, 2014 IL 115102, ¶ 101.

sentence without parole (*People v. Reyes*, 2016 IL 119271, ¶¶ 9-10); and (3) any sentence exceeding 40 years is a *de facto* life sentence requiring the sentencing court to consider, before imposition, youth and its attendant circumstances (*Buffer*, 2019 IL 122327, ¶¶ 41-42). Thus, a court may sentence a juvenile to natural life or a *de facto* life sentence; however, to comply with constitutional requirements, the sentencing court must first

> "determine[ ] that the defendant's conduct showed *irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation*. The court may make that decision only after considering the defendant's youth and its attendant characteristics. Those characteristics include, but are not limited to, the following factors: (1) the juvenile defendant's chronological age at the time of the offense and any evidence of his particular immaturity, impetuosity, and failure to appreciate risks and consequences; (2) the juvenile defendant's family and home environment; (3) the juvenile defendant's degree of participation in the homicide and any evidence of familial or peer pressures that may have affected him; (4) the juvenile defendant's incompetence, including his inability to deal with police officers or prosecutors and his incapacity to assist his own attorneys; and (5) the juvenile defendant's prospects for rehabilitation." (Emphasis added.) *Holman*, 2017 IL 120655, ¶ 46 (citing *Miller*, 567 U.S. at 477-78).

¶ 20    Indeed, this state has now codified the *Miller* factors. Specifically, section 5-4.5-105(a) of the Unified Code of Corrections (Code) provides that, when a person under 18 years of age commits an offense, the trial court at the sentencing hearing shall consider the following factors in mitigation: (1) the person's age, impetuosity, and level of maturity at the time of the offense, including the ability to consider risks and consequences of behavior, and the presence of cognitive or developmental disability, or both, if any; (2) whether the person was subjected to outside

pressure, including peer pressure, familial pressure, or negative influences; (3) the person's family, home environment, educational and social background, including any history of parental neglect, physical abuse, or other childhood trauma; (4) the person's potential for rehabilitation or evidence of rehabilitation, or both; (5) the circumstances of the offense; (6) the person's degree of participation and specific role in the offense, including the level of planning by the defendant before the offense; (7) whether the person was able to meaningfully participate in his or her defense; (8) the person's prior juvenile or criminal history; and (9) any other information the court finds relevant and reliable, including an expression of remorse, if appropriate, although, if a defendant chooses not to make a statement on advice of counsel, a lack of an expression of remorse shall not be considered as an aggravating factor. 730 ILCS 5/5-4.5-105(a) (West 2016).

¶ 21    Here, defendant argues that, in light of the foregoing, his sentence constitutes an unconstitutional *de facto* life sentence, as the court was required to impose more than 40 years' imprisonment without adequate consideration of his youth and its attendant circumstances. The State disagrees with defendant's calculation of his total sentence (asserting that, with truth-in-sentencing and other considerations, the sentence totals 67.3 years) but does not dispute that, either way, per *Buffer*, defendant received a *de facto* life sentence. Indeed, we agree that the applicable sentencing scheme, at that time, *mandated* a minimum 71-year sentence (45-year minimum for first-degree murder while discharging a firearm, consecutive to 26-year minimum for attempted first-degree murder while discharging firearm). See 730 ILCS 5/5-4.5-20(a) (West 2010) (range of 20 to 60 years for first-degree murder); 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2010) (mandatory add-on of 25 years to natural life); 720 ILCS 5/8-4(c)(1)(C) (West 2010) (attempted murder is a Class X felony, and 20 years must be added if the defendant discharged a firearm); 730 ILCS 5/5-4.5-25(a) (West 2010) (range for a Class X felony is 6 to 30 years); 730 ILCS 5/5-8-4(d)(1) (West

2010) (providing for mandatory consecutive sentences). Moreover, defendant received an aggregate 75-year sentence (45 years for first-degree murder and 30 years for attempted murder); the defendant must serve his murder sentence at 100% and the attempted-murder sentence at 85% (730 ILCS 5/3-6-3(a)(2)(i)-(ii) (West 2010)). As such, and as the State concedes, defendant undeniably received a *de facto* life sentence.

¶ 22    The State nevertheless disagrees that defendant's life sentence violates the eighth amendment. It contends that the trial court considered defendant's youth and its attendant circumstances and, further, that the record reflects that defendant is the rare juvenile whose irreparable corruption warrants his life sentence. Specifically, the State notes that the record "amply" reflects that the court "fully considered defendant's youth," that the record itself contained information to support the required findings, and that the court was not, in any event, required to make explicit findings of incorrigibility. For example, the State identifies the court's comment that defendant decided "in his very young life" to pursue gang activity. Further, the State points out that there were photos of defendant in the record and that his youth would also have manifested itself by his presence at trial. Also, the State notes that, during *voir dire*, prospective jurors commented on defendant's youthful appearance and that defense counsel commented in closing argument on the length of sentences received by the teenage witnesses who testified on the State's behalf. Moreover, the State notes that letters submitted on defendant's behalf at sentencing emphasized his youth. The State concludes that it is "amply demonstrated that the sentencing judge was cognizant of and fully considered the defendant's youth at sentencing" and that the length of the sentence was, therefore, character-driven. Indeed, the State comments that applying the relevant factors to this case reflects that (1) defendant was not susceptible to peer pressure, and (2) was fully aware of the consequences of his actions. He was the person exerting pressure on

other gang members to commit the crime. Afterward, he bragged about the shooting and celebrated by obtaining new gang tattoos. Finally, the State notes, the record reflects that, after this crime, defendant displayed a callous attitude and aided in other crimes.

¶ 23    We conclude that defendant's sentence violates the eighth amendment and that he is entitled to a new sentencing hearing. The framework for sentencing juvenile defendants to life imprisonment has evolved since the trial court sentenced defendant here. Indeed, *Miller* was filed in June 2012, which is *after* the court sentenced defendant and ruled on his motion to reconsider the sentence. As such, the sentencing court was unable to consider defendant's youth and attendant circumstances under the framework that has since developed in caselaw, as summarized above. Nor did it possess any discretion to impose less than a mandatory *de facto* life sentence. Critical to this case, and as we noted in our prior decision, the court was unable to apply any discretion concerning the mandatory firearm enhancements, but that now has changed. See 730 ILCS 5/5-4.5-105(b), (c) (West 2018) (sentencing scheme for juveniles now affords sentencing courts *discretion* to apply the firearm enhancement).[2]

---

[2] The State incorrectly suggests that the *discretionary* enhancement is inapplicable or unavailable here because (1) defendant was sentenced before the statute was enacted and (2) the supreme court's supervisory order vacated only our decision, not defendant's sentence. First, as *we* are vacating defendant's sentence as unconstitutional and remanding for a new sentencing hearing, defendant may be sentenced under the scheme prescribed by section 5-4.5-105 of the Code. See 730 ILCS 5/5-4.5-105 (West 2018); *Buffer*, 2019 IL 122327, ¶ 47; see also *Reyes*, 2016 IL 119271, ¶ 12. Second, and as stated in the case upon which the State primarily relies for its argument, "[w]here *** a defendant's sentence is vacated on appeal and the matter remanded for

¶ 24     We do not disagree with the State that, as delineated in its appellate brief, the court here was aware of defendant's youth at the time of his crimes, and the record reflects facts and circumstances that *may* bear upon the relevant factors. The State emphasizes that, with his callous attitude and continued criminality after the crimes at issue, defendant is the rare juvenile whose irreparable corruption warrants his life sentence—thus, constitutional requirements were satisfied. Here, we must disagree. When the court considered defendant's sentence, the relevant factors were not *established.*[3] Mere *general* consideration of youth is a far cry from evaluating the relevant factors to find that defendant is that rare juvenile whose criminal conduct was indicative of irreparable corruption beyond the possibility of rehabilitation. See, *e.g.*, *Buffer*, 2019 IL 122327, ¶ 41; *Holman*, 2017 IL 120655, ¶¶ 45-46. Indeed, a life sentence for a juvenile is appropriate *only* where that defendant is the "*rare* juvenile offender" whose crime reflects "*irretrievable* depravity, *permanent* incorrigibility, or *irreparable* corruption beyond the possibility of rehabilitation." (Emphases added and internal quotation marks omitted.) *Holman*, 2017 IL 120655, ¶¶ 36, 46; *Montgomery v. Louisiana*, 577 U.S. ___, ___, 136 S. Ct. 718, 734 (2016). Moreover, the Court has clarified that it is not sufficient for a sentencing judge to merely "consider a juvenile offender's youth"; rather, the penological justifications for a life sentence without parole entirely collapse for the juvenile offender, unless that offender is the "rare" child whose crime reflects more than

---

resentencing, under section 4 of the Statute on Statutes, the defendant may elect to be sentenced under the law in effect at the time of the new sentencing hearing." *People v. Hunter*, 2017 IL 121306, ¶ 54.

[3] We note that *Miller* applies retroactively. See, *e.g.*, *People v. Davis*, 2014 IL 115595, ¶ 39.

"unfortunate yet transient immaturity." (Internal quotation marks omitted.) *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 734. While express findings of incorrigibility are not required (*id.* at ___, 136 S. Ct. at 735), sentencing courts must still "determine" and somehow express, after considering the defendant's youth and the enumerated attendant circumstances, that "the defendant's conduct showed irretrievable depravity, permanent incorrigibility, or irreparable corruption beyond the possibility of rehabilitation." *Holman*, 2017 IL 120655, ¶ 46. The court did not make any of those findings here. Again, the court did not possess the yet-to-be-developed framework that now exists for considering defendant's youth. Further, the trial court found that defendant had a relatively minor criminal history and was a "very nice" person and a gifted athlete in his early years. His behavior appeared to change after a custody modification, and he had a family who was impacted by the crime and sentence. Yet, the statutory sentencing scheme required the court to impose upon defendant a *de facto* life sentence.

¶ 25     In sum, as we recently noted in *People v. Luna*, 2020 IL App (2d) 121216-B, ¶ 29, *all* juveniles who are theoretically eligible for life sentences will have committed horrific crimes. Yet current case law instructs that *not* all of those juveniles eligible for life sentences should receive them. The framework for sentencing juveniles has markedly evolved since defendant's sentence was imposed. The codification of the *Miller* factors, the elimination of mandatory enhancements for juveniles, and the issuance of *Buffer* all occurred after sentencing in this case. As such, the court could not benefit from the current scope of analysis concerning juvenile culpability, nor did it have at its disposal the modifications to sentencing parameters. Accordingly, we conclude that defendant is entitled to a new sentencing hearing under the scheme prescribed by section 5-4.5-105 of the Code. See *Buffer*, 2019 IL 122327, ¶ 47; see also *Reyes*, 2016 IL 119271, ¶ 12. On remand, we caution that the sentencing judge may not simply claim to have followed the *Miller*

factors. The judge must *use* those factors to evaluate evidence at the new sentencing hearing to determine whether defendant is "among the rarest of juvenile offenders whose conduct places him [or her] beyond the possibility of rehabilitation." See, *e.g.*, *People v. Reyes*, 2020 IL App (2d) 180237, ¶¶ 25, 31-32. We express no view about the sentence that defendant should ultimately receive; however, "[o]n remand, the trial court could once again impose a *de facto* life sentence only if it determines that the defendant is beyond rehabilitation." (Emphasis omitted.) *Id.* ¶ 32.

¶ 26    In sum, we affirm defendant's conviction, vacate his sentence, and remand for resentencing in accordance with this decision.

¶ 27                                III. CONCLUSION

¶ 28    For the foregoing reasons, the judgment of the circuit court of Kane County is affirmed in part and vacated in part. We remand the cause for resentencing.

¶ 29    Affirmed in part and vacated in part.

¶ 30    Cause remanded.

---

**No. 2-12-0171**

---

| | |
|---|---|
| **Cite as:** | *People v. Cavazos*, 2020 IL App (2d) 120171-B |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Kane County, No. 08-CF-3321; the Hon. Timothy Q. Sheldon, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Jennifer L. Bontrager, of State Appellate Defender's Office, of Chicago, for appellant. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Joseph H. McMahon, State's Attorney, of St. Charles (Patrick Delfino, Edward R. Psenicka, and Diane L. Campbell, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People. |

---